In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3549

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAYMOND L. HENDERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 17-CR-30072 — **Sue E. Myerscough**, *Judge.*

ARGUED FEBRUARY 28, 2018 — DECIDED FEBRUARY 14, 2019

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Raymond Henderson was arraigned on drug and firearm charges while shackled with leg irons and handcuffs connected to a waist chain. His attorney asked the district judge to have the shackles removed. The judge denied the request, deferring to the United States Marshals Service's policy of using full restraints on prisoners at every nonjury court appearance. Henderson appealed the ruling, relying on the collateral-order doctrine to support

interlocutory review. After oral argument we ordered sup-
plemental briefing on the possibility of mandamus as an
alternative means of review if Henderson's argument about
the collateral-order doctrine failed. We also gave the judge
an opportunity to respond as provided in Rule 21 of the
Federal Rules of Appellate Procedure, which governs man-
damus procedure. She has done so. We now hold that the
collateral-order doctrine does not apply and decline to
reframe the appeal as a petition for a writ of mandamus. We
therefore dismiss the appeal for lack of jurisdiction.

### I. Background

A grand jury in the Central District of Illinois indicted
Henderson for possession of crack cocaine with intent to
distribute and two related firearms offenses. In accordance
with the Marshals Service's policy in the Springfield
Division, Henderson appeared in court for arraignment
encircled by four security officers and shackled with leg
irons and handcuffs connected to a waist chain. His attorney
moved to have him unshackled except for the leg irons for
the remainder of the arraignment and at all future pretrial
hearings. Counsel argued that routine shackling in court
violates the accused's right to due process and asked the
judge to hold a hearing to determine whether Henderson
posed an individualized risk to justify the use of full re-
straints.

More specifically, counsel argued that a criminal accused
has a deeply rooted fundamental right not to be shackled in
court proceedings absent an individualized showing of risk
of flight or violence. The Supreme Court has held that the
Due Process Clause forbids the routine use of shackles
before the jury. *Deck v. Missouri*, 544 U.S. 622, 629 (2005).

Counsel urged the judge to apply the same rule to pretrial proceedings and conduct an individualized risk assessment as *Deck* requires. Finally, counsel argued that the judge, not the Marshals Service, is ultimately responsible for the decision to use restraints in court, and a default position of deference to security officials abdicates that judicial responsibility.

The government responded with three points. First, *Deck*'s rule against restraints in court is expressly limited to the use of shackles in the presence of a jury. *Id.* Second, the reasons underlying the *Deck* rule have little, if any, applicability to nonjury proceedings like an arraignment and other pretrial hearings. Third, *Deck* relied in large part on the common-law rule against shackles, which is limited to jury trials and does not extend to arraignment or "like proceedings before the judge." *Id.* at 626. The government urged the court to apply the standard in *Bell v. Wolfish*, 441 U.S. 520 (1979), which governs conditions of confinement for pretrial detainees. Under that standard, the government argued, the use of shackles in pretrial proceedings is not a form of punishment and thus is constitutionally permissible.

In an oral ruling, the judge denied Henderson's motion, declaring that "court security is up to our Court Security and Marshals" and later saying that she was "concerned that [Henderson] might take off." The judge issued a follow-up written order that same day, noting that because of "the reasons stated in the [g]overnment's response," she would "continue to defer to the expertise of the United States Marshals Service" without making "an individualized determination that shackling is necessary."

Henderson appealed the judge's order, invoking the collateral-order doctrine and arguing that he has a due-process right to appear before the court unshackled and that this right applies in nonjury proceedings. At oral argument we asked whether mandamus is available as an alternative basis for interlocutory review should Henderson's invocation of the collateral-order doctrine fail. Because the parties had not formally addressed that question, we ordered supplemental briefing on the availability of supervisory or advisory mandamus and gave the district judge an opportunity to respond as if Henderson's appeal were construed as a petition for a writ of mandamus. *See* FED. R. APP. P. 21(b)(4) (describing mandamus procedure and stating that "[t]he court of appeals may invite or order the trial-court judge to address the petition or may invite an amicus curiae to do so").

The judge accepted our invitation. She explained that mandamus is inappropriate because *Deck*'s requirement of an individualized risk assessment applies only when shackles are used at a jury trial and thus Henderson had not shown that he has a "clear and indisputable" right to the writ. *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 997 (7th Cir. 1980). The government agreed with the judge and added that mandamus is not warranted because Henderson has other adequate means to pursue his due-process claim and because this is not an "exceptional" circumstance that would justify issuance of the writ.

Henderson argued that either supervisory or advisory mandamus is appropriate because the issue presented is important, novel, recurring, and would otherwise evade effective appellate review. *See id.*; *United States v. Green*,

407 F.3d 434, 439 (1st Cir. 2005) (explaining advisory and supervisory mandamus). He also reiterated his position that the shackling order is immediately reviewable under the collateral-order doctrine.

## II. Discussion

We begin (and also end) with the question of appellate jurisdiction. Our jurisdiction is limited to appeals from a final order of the district court. *See* 28 U.S.C. § 1291. The judge's shackling ruling obviously is not a final order; the case remains pending in the district court. Henderson argues that the collateral-order doctrine supports interlocutory review. That doctrine allows immediate appeal of interlocutory orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

To qualify for immediate review under this exception, an order "must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). The Supreme Court has emphasized that the collateral-order doctrine is "a narrow exception to the normal application of the final judgment rule," and in criminal cases its requirements are applied "with the utmost strictness." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798–99 (1989) (quoting *Flanagan v. United States*, 465 U.S. 259, 265 (1984)).

This case turns on the third step of the *Coopers & Lybrand* test, which asks whether the order in question is effectively unreviewable on appeal from a final judgment. The Supreme Court's seminal shackling case demonstrates that this requirement is not met here. In *Deck* the defendant objected to appearing before the jury in shackles during the penalty phase of his capital murder trial. 544 U.S. at 624–25. The Supreme Court reversed the defendant's death sentence, holding that shackling him in front of the jury violated his right to due process. *Id.* at 635. *Deck* establishes that due-process shackling claims may be effectively reviewed on appeal from a final judgment. That alone forecloses interlocutory review.

On a broader level, in criminal cases the Court has identified only four pretrial orders that qualify for immediate review under the collateral-order doctrine: (1) an order denying bail, *Stack v. Boyle*, 342 U.S. 1 (1951); (2) an order denying dismissal based on double jeopardy, *Abney v. United States*, 431 U.S. 651 (1977); (3) an order denying dismissal under the Speech or Debate Clause, *Helstoski v. Meanor*, 442 U.S. 500 (1979); and (4) an order for the administration of psychotropic medication to render a defendant competent for trial, *Sell v. United States*, 539 U.S. 166 (2003). We recently noted the distinguishing characteristics of orders of this type: "Bail and involuntary medication are independent of the merits and unreviewable on appeal from a conviction, while the other two situations exemplify rights not to be tried." *United States v. Schock*, 891 F.3d 334, 339 (7th Cir. 2018).

On the other hand, the Court has held that a constitutional objection to an attorney-disqualification order is

effectively reviewable on appeal from a final judgment. *Flanagan*, 465 U.S. at 269–70. The Court also has refused to extend the collateral-order doctrine to pretrial orders denying dismissal under the Speedy Trial Clause. *United States v. MacDonald*, 435 U.S. 850, 861–63 (1978). These cases presented ordinary claims of constitutional procedural error for which appeal from a final judgment provides effective review. Henderson's shackling claim is in the same category.

*Schock* is our most recent exploration of the collateral-order doctrine in a criminal case. A former congressman appealed an order denying his motion to dismiss an indictment charging him with fraud and making false statements. 891 F.3d at 336. He moved to dismiss based on the Speech or Debate Clause, U.S. CONST. art. 1, § 6, cl. 1 (immunizing members of Congress from liability for their speeches, debates, and other parts of the legislative process), and the Rulemaking Clause, *id.* art. I, § 5, cl. 2 (stating that each House of Congress may determine its own rules and punish its members). The district court denied the motion, and the defendant immediately appealed; we affirmed in part and dismissed in part. The Speech or Debate Clause, we explained, confers an immunity from litigation, so we addressed the merits and affirmed the denial of the dismissal motion on this ground. *Schock*, 891 F.3d at 336. We dismissed the rest of the appeal for lack of jurisdiction, holding that an order refusing to dismiss an indictment under the Rulemaking Clause does not qualify for immediate review under the collateral-order doctrine. *Id.* at 338–39. The defendant's claim—a kind of separation-of-powers defense—could be effectively reviewed on appeal from a final judgment. *Id.*

The same is true here. As *Deck* shows, a due-process challenge to a shackling order can be vindicated on appeal from a final judgment. Henderson argues that the possibility of acquittal, from which he cannot appeal, entitles him to review now. But acquittal is possible in every criminal case and so cannot justify application of the collateral-order exception.

Turning now to the issue of mandamus, we begin by reiterating that Henderson did not petition for the writ. Ordinarily we will not construe an appeal as a petition for mandamus if the appellant "failed to apply for [the] writ in accordance with the requirements of Federal Rule of Appellate Procedure 21(a)." *Geaney v. Carlson*, 776 F.2d 140, 142 (7th Cir. 1985).

However, in a case involving a similar interlocutory appeal of a pretrial shackling order, the Ninth Circuit, sitting en banc, recast the notice of appeal as a petition for mandamus and reached the merits of the defendants' due-process claim. *United States v. Sanchez-Gomez*, 859 F.3d 649, 657 (9th Cir. 2017) (en banc). Although the underlying criminal proceedings were long since over, the en banc court declined to dismiss the case as moot. *Id.* at 657–59. Rather, after reframing the appeal as a mandamus petition, the court construed the defendants' claim as a "functional class action," *id.* at 658, and found a constitutional violation, *id.* at 666.

As we've explained, in light of *Sanchez-Gomez*, we issued an order for supplemental briefing asking the parties to address the propriety of construing this appeal as a petition for mandamus. They complied. We also invited the district judge to respond as provided in Rule 21(b)(4), and she took

the opportunity to do so. While we've had this case under advisement, however, the Supreme Court vacated the Ninth Circuit's judgment and remanded with instructions to dismiss the case as moot. *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1542 (2018).

We do not have a mootness problem here; the underlying criminal case remains pending. Still, we will not follow the Ninth Circuit's lead. The All Writs Act codifies the common-law writ of mandamus: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (internal quotation marks omitted). "[O]nly exceptional circumstances amounting to a judicial usurpation of power … or a clear abuse of discretion … will justify the invocation of this extraordinary remedy." *Id.* (quotation marks and citations omitted).

The mandamus writ "is one of the most potent weapons in the judicial arsenal" and may issue only if three conditions are satisfied. *Id.* (internal quotation marks omitted). First, the petitioner must establish that he has no other adequate remedy—"a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Id.* at 380–81. Second, the petitioner must show that his right to the issuance of the writ "is clear and indisputable." *Id.* at 381 (internal quotation marks omitted); *see also J.H. Cohn & Co.*, 628 F.2d at 997. Third, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is

appropriate under the circumstances." *Cheney*, 542 U.S. at 381.

Henderson's argument for reframing the appeal as a petition for mandamus falters at the first step. As we've already explained, a due-process challenge to the judge's shackling order can be effectively reviewed as part of the "regular appeals process," so Henderson does not lack an adequate remedy. Accordingly, we decline to construe the notice of appeal as a petition for mandamus.

We're left with an interlocutory appeal that does not fall within the collateral-order doctrine. We therefore DISMISS the appeal for lack of jurisdiction.

HAMILTON, *Circuit Judge*, dissenting. The law governing the use of physical restraints on the accused in the courtroom can sometimes produce an uneasy compromise, between safety on one hand and fairness, dignity, and decorum on the other. In this appeal, the district court has failed to comply with two principles that shape that body of law. First, the court defers courtroom security issues to the United States Marshals Service and its preferred policy: for all detained defendants, wrists, ankles, and waists are chained together routinely, for all in-court proceedings without a jury. Deferring the decision to the Marshals Service is not consistent with the role of the judge. Second, absent special risks, the use of full restraints on a presumptively innocent defendant in the courtroom simply is not consistent with basic fairness, dignity, and decorum in the courts of the United States.

I therefore respectfully dissent from dismissal of this appeal. We should use our power to issue a supervisory writ of mandamus to require the district court to stop the routine use of such full restraints in pretrial hearings. On the merits of this appeal, I agree in essence with the Ninth Circuit's en banc opinion in *United States v. Sanchez-Gomez*, 859 F.3d 649 (9th Cir. 2017) (en banc), vacated as moot, 138 S. Ct. 1532 (2018), though I would base a decision here on our supervisory power rather than decide whether the Constitution itself requires the relief.

Before going further, I must make two points based on more than twenty years as a federal judge, most in a district court with a full criminal docket. First, I have depended on the courage, discipline, professionalism, and diplomacy of the men and women of the United States Marshals Service. Like so many other judges, I have depended on marshals both to

maintain safety in the courthouse and the courtroom and to maintain the dignity, decorum, and respect for all that are essential to the rule of law.

Second, in some exceptional cases, defendants and their associates pose extraordinary risks that justify measures such as the full restraints, even in the courtroom. The courts of the United States of America take pride in trying fairly some of the most dangerous people in the world, including terrorists, serial killers, organized crime leaders, and drug kingpins and their henchmen. When criminal associates can learn in advance exactly when the defendant will be present outside a jail or prison, in a federal courtroom, that can raise the risk of a rare attempt at escape. As a district judge, I often benefited from the advice of the Marshals Service on appropriate security measures to deal with unusual risks. Yet in all but the rarest cases, the marshals and I were satisfied with at most ankle restraints that were kept out of sight.

This appeal, however, is not about exceptional measures to deal with exceptional risks. It is about routine practices. Part I explains below the challenged practice. Part II lays out what might be called the law of courtroom restraints, emphasizing two points. First, a trial judge may not delegate to others, including the Marshals Service, the decision about restraints in the courtroom. Second, excessive restraints in the courtroom matter even when no jury is present. The practice in this district court runs contrary to both of those principles. Part III explains why a supervisory writ of mandamus is the appropriate procedure to address the court's practice.

I.   *The Challenged Practice*

The practice in this district court in criminal cases is to keep all detained defendants in "full" restraints in all pretrial proceedings. Full restraints link the defendant's wrists and ankles to a chain at his waist. A Marshals Service photograph of prisoners in such restraints is in the Appendix at A26. Steel handcuffs are linked by a short chain to each other and linked by another short chain to yet another chain at the prisoner's waist. Steel ankle restraints are linked by a short steel chain to each other and by another short chain to the chain around the prisoner's waist. The prisoner can barely move, of course. That's the idea. He cannot walk but can only shuffle slowly. While standing, he cannot lift his hands to his chin, nor can he move his hands more than a few inches apart. Lawyers and judges who take for granted their ability to take notes during court proceedings should try to imagine how difficult it is for such a restrained defendant merely to take notes about points to discuss with his lawyer at the next recess.

Consider how this practice works in a contested hearing, where the judge must evaluate credibility. In opposing a motion to suppress, for example, the government witnesses appear in crisp police uniforms as the protectors of society. They explain why the stop or search was justified. The defendant must shuffle slowly to the witness stand, chained like a wild beast, unable to gesture or even to scratch his head. He testifies to a very different version of the stop or search, one that would render it unconstitutional. In deciding a close case of credibility, how often will a judge be able to overcome the subconscious effects of the witnesses' appearances?

To be clear, defendant Henderson has no objection to the use of only leg irons in the courtroom. He also does not challenge any aspect of the Marshals Service management of prisoners outside the courtroom itself. Movements of prisoners outside the secure environments of jail or prison pose heightened risks, and they rarely implicate the considerations of dignity and fairness that are so important in the courtroom itself. The focus here is only on full restraints in the courtroom.

II. *The Law of Courtroom Restraints*

The presumption of innocence lies at the heart of our system of criminal justice. In a series of cases, the Supreme Court has held that both constitutional principles of due process and non-constitutional principles of fair administration of justice require courts not to impose excessive physical restraints on the accused, who is still presumed innocent.

In *Illinois v. Allen*, 397 U.S. 337, 344 (1970), the Supreme Court wrote that an accused could be tried while shackled and gagged, or even removed from the courtroom altogether, but only as last resorts based on the accused's repeated and aggravated refusals to behave in court. Defendant Allen had earned such rare treatment in his jury trial by repeatedly disrupting the proceedings to the extent that an orderly trial was impossible if he was present and able to speak and interrupt. In *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986), the Court found acceptable the presence of uniformed police in the front row of the courtroom, finding that security measure was not an "inherently prejudicial" practice, like shackling, that "should be permitted only where justified by an essential state interest specific to each trial."

In *Deck v. Missouri*, 544 U.S. 622, 626–29 (2005), the Supreme Court made clear that during the guilt phase of a criminal trial, the due process clauses of the Fifth and Fourteenth Amendments forbid routine use of visible shackles. Drawing on English sources older than the United States, *Deck* identified the traditional common law rule that defendants "must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape." *Id.* at 626, quoting 4 W. Blackstone, *Commentaries on the Laws of England* 317 (1769). Only in "extreme and exceptional cases, where the safe custody of the prisoner and the peace of the tribunal imperatively demand, the manacles may be retained." *Id.* at 626–27, quoting 1 J. Bishop, *New Criminal Procedure* § 955, p. 573 (4th Ed. 1895). *Deck* then extended the constitutional limits on visible shackles to the sentencing phase of capital cases, even though the defendant is by that point no longer presumed innocent. *Id*. at 633.

We and other courts have often addressed similar issues involving both jury trials and other criminal proceedings. Closest to this case, the Ninth Circuit in *Sanchez-Gomez* disapproved a district-wide practice like the district court's here. 859 F.3d at 659–65. While that decision was vacated as moot, it is persuasive on the merits, at least as a matter of sound judicial administration. See also, e.g., *United States v. Van Sach*, 458 F.3d 694, 699–700 (7th Cir. 2006) (affirming use of leg shackles during jury trial based on defendant's extensive history of belligerence and threatening behavior in court); *United States v. Fountain*, 768 F.2d 790 (7th Cir. 1985) (same, based on defendants' violent history); *United States v. Miller*, 531 F.3d 340, 345 (6th Cir. 2008) (trial judge abused discretion by deferring without explanation to marshal's recommendation that

defendant wear stun-belt in jury trial); *United States v. Durham*, 287 F.3d 1297, 1304 (11th Cir. 2002) (same).

The cases show two points critical for Henderson's challenge. First, decisions about such extraordinary restraints are decisions *for the judge*. They are not to be delegated to security or correctional personnel, including the Marshals Service. Second, the reasons for the limits on such extraordinary restraints apply to criminal hearings broadly; those reasons are not limited to only what a jury might see.

A. *No Delegation of the Judicial Responsibility*

One central theme of the law of courtroom restraints is that the trial judge is the person responsible for making the decisions. The judge cannot simply delegate that responsibility to the Marshals Service or other correctional or security staff.

We have made this point repeatedly. E.g., *Lopez v. Thurmer*, 573 F.3d 484, 493 n.2 (7th Cir. 2009) ("although a trial court's decisions about the required level of security during a trial are entitled to deference, those decisions must be made by the court itself; the trial judge 'may not delegate his discretion to another party'"), quoting *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1997). "While the trial court may rely 'heavily' on the marshals in evaluating the appropriate security measures to take with a given prisoner, the court bears the ultimate responsibility for that determination and may not delegate the decision to shackle an inmate to the marshals." *Woods v. Thieret*, 5 F.3d 244, 248 (7th Cir. 1993), quoting *Lemons v. Skidmore*, 985 F.2d 354, 358 n.4 (7th Cir. 1993). Accord, e.g., *Sanchez-Gomez*, 859 F.3d at 661 ("Courts cannot delegate this constitutional question to those who provide security, such as

the U.S. Marshals Service."); *United States v. Wardell*, 591 F.3d 1279, 1294–95 (10th Cir. 2009) (collecting cases and emphasizing that trial court has "legal duty to make a thorough and independent determination" of need for device); *Miller*, 531 F.3d at 345 ("a district court's blind adherence to a corrections officer's recommendation, without making any individualized determinations or specific findings, amounts to an abuse of discretion"); *Gonzalez v. Pliler*, 341 F.3d 897, 902 (9th Cir. 2003) ("The use of physical restraints is subject to close *judicial*, not law enforcement, scrutiny.") (emphasis in original).

This need for a decision by the judge runs through the Supreme Court's decisions on courtroom restraints, as well. See *Allen*, 397 U.S. at 343 (judge "must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations."); *Deck*, 544 U.S. at 629 (Fifth and Fourteenth Amendment prohibit use of physical restraints visible to the jury "absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial").[1]

---

[1] Our precedents also show a consistent preference for the least restrictive physical restraints needed for courtroom security. *Stephenson v. Wilson*, 619 F.3d 664, 668 (7th Cir. 2010) ("placing any kind of visible restraint on a defendant's movement during a criminal trial was permissible . . . only if less conspicuous security measures . . . would be insufficient"); *Brooks*, 125 F.3d at 502 ("a defendant is entitled to the minimum restraints necessary and to the least obvious ones"); see also, *Durham*, 287 F.3d at 1304 (courts must ask "whether less restrictive, less prejudicial methods of restraint were considered or could have been employed"), quoting *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir. 1987); *United States v. Moore*, 651 F.3d 30, 47 (D.C. Cir. 2011) (same).

B.  *It's Not Just About the Jury*

The use of courtroom restraints has been litigated most often when the restraints are used during jury trials. That's where the dangers of unfair prejudice are most severe, and where, if any restraints are to be used, the usual course is to ensure they are never visible to the jury. Yet the reasons for the limits on courtroom restraints apply more broadly. They weigh in favor of applying those limits to pretrial proceedings. The Court laid out these reasons in *Deck v. Missouri*.

First, of course, the criminal justice system presumes the defendant is innocent unless and until proved guilty. 544 U.S. at 630. "Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Id*. By necessity, we trust judges to be less vulnerable than lay jurors to this and other forms of unfair prejudice. Yet we defy psychological realities if we insist that the human beings who serve on the bench are immune to such subconscious and subliminal influence from seeing a human being in chains to protect others from him.

Second, *Deck* invoked the right to counsel because full shackles can interfere with the accused's ability to communicate with his lawyer. 544 U.S. at 631, quoting *Allen*, 397 U.S. at 344. Courts have long expressed concerns that shackles can be heavy and painful, distracting the accused from focusing on his defense. E.g., *Durham*, 287 F.3d at 1304 (restraints "may confuse the defendant, impair his ability to confer with counsel, and significantly affect the trial strategy he chooses to follow"); *People v. Harrington*, 42 Cal. 165, 168 (1871), quoted in *Deck*, 544 U.S. at 631. These forms of interference do not depend on whether a jury is present.

Third, and most important here, "judges must seek to maintain a judicial process that is a dignified process." *Deck*, 544 U.S. at 631. This dignity is for the good of the institution and the public. The *Deck* Court continued:

> The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve.

*Id.*

In *Allen*, the Supreme Court acknowledged that the use of shackles and gags in court "is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." 397 U.S. at 344. Full restraints make the prisoner look like a wild and dangerous beast, not fit for human society. "A presumptively innocent defendant has the right to be treated with respect and dignity in a public courtroom, not like a bear on a chain." *Sanchez-Gomez*, 859 F.3d at 661. "We must not exaggerate the distance between 'us,' the lawful ones, the respectable ones, and the prison and jail population; for such exaggeration will make it too easy for us to deny that population the rudiments of humane consideration." *Johnson v. Phelan*, 69 F.3d 144, 152 (7th Cir. 1995) (Posner, C.J., dissenting).

Such routine treatment is unfair to the defendant, and it diminishes the courts:

> Courtrooms are palaces of justice, imbued with a majesty that reflects the gravity of proceedings designed to deprive a person of liberty or even life. A member of the public who wanders into a criminal courtroom must immediately perceive that it is a place where justice is administered with due regard to individuals whom the law presumes to be innocent. That perception cannot prevail if defendants are marched in like convicts on a chain gang. Both the defendant and the public have the right to a dignified, inspiring and open court process. Thus, innocent defendants may not be shackled at any point in the courtroom unless there is an individualized showing of need.

*Sanchez-Gomez*, 859 F.3d at 662. The Ninth Circuit went on to emphasize that these institutional concerns are present whether the hearing is before a jury or a judge:

> We must take seriously how we treat individuals who come into contact with our criminal justice system—from how our police interact with them on the street to how they appear in the courtroom. How the justice system treats people in these public settings matters for the public's perception, including that of the defendant. Practices like routine shackling and "perp walks" are inconsistent with our constitutional presumption that people who have not been convicted of a crime are innocent until proven

> otherwise. That's why we must examine these practices more skeptically than those deployed in an institutional setting like [*Bell v. Wolfish*, 441 U.S. 520 (1979)]. *See, e.g., Deck*, 544 U.S. at 634 (holding that a defendant's Fifth Amendment rights were violated by visible shackling before a jury at capital sentencing proceedings); *Lauro v. Charles*, 219 F.3d 202, 212–13 (2d Cir. 2000) (holding that a defendant's Fourth Amendment rights were violated by a staged and filmed perp walk done without a legitimate law enforcement reason). We must treat people with respect and dignity even though they are suspected of a crime.

859 F.3d at 665.

C. *The Dictum in Deck*

The government argues here that the limits on excessive restraints simply do not apply at arraignments and other pretrial criminal proceedings where no jury is present. The government relies in part on this comment in *Deck*, in its review of the history of courtroom restraints:

> Blackstone and other English authorities recognized that the rule did not apply at "the time of arraignment," or like proceedings before the judge. Blackstone, supra, at 317; see also *Trial of Christopher Layer*, 16 How. St. Tr. 94, 99 (K.B.1722). It was meant to protect defendants appearing at trial before a jury. See *King v. Waite*, 1 Leach 28, 36, 168 Eng. Rep. 117, 120 (K.B.1743)

("[B]eing put upon his trial, the Court immediately ordered [the defendant's] fetters to be knocked off").

544 U.S. at 626.

As important as *Deck* is in this field of law, this passing observation about arraignment was demonstrably wrong. The Ninth Circuit's opinion in *Sanchez-Gomez* reviewed the historical sources in detail and showed that the arraignment comment in *Deck* was not supported by those sources. The Ninth Circuit explored Blackstone and *Layer* at length, explaining persuasively that *Layer* "applied the exception to Blackstone's basic rule" against shackling, and that in general "shackling at arraignment was allowed after a showing of need," and not as a matter of routine. 859 F.3d at 664. That sort of individualized policy is all that Henderson seeks here. Though the opinion in *Sanchez-Gomez* was later vacated as moot (the defendants there had already pled guilty), the Supreme Court did not cast any doubt on this persuasive historical critique of the *Deck* comment or on the Ninth Circuit's analysis of the impact of routine shackling on the courtroom environment. See *United States v. Sanchez-Gomez*, 138 S. Ct. 1532 (2018).

III. *Appellate Jurisdiction*

The routine use of full restraints on pretrial defendants is a subject on which we can and should use our supervisory power through a writ of mandamus, which is the only meaningful route to appellate review of this practice. We should limit the pretrial use of courtroom restraints to cases in which the judge personally concludes they are necessary, based not

on the Marshals Service preference for full restraints on everyone, but on an assessment of the needs of the particular case and defendant.

A.  *Collateral Order?*

The majority finds that the judge's order to keep defendant Henderson in full restraints during all pretrial hearings cannot be appealed under 28 U.S.C. § 1291 as a collateral order. This order was conclusive, separate from the merits, and in my opinion effectively unreviewable on appeal from a final judgment. There is room to argue that this order meets the standards for collateral orders, but the majority here is correct that the Supreme Court has identified only four pretrial orders that qualify in criminal cases: denial of bail, denial of dismissal based on double jeopardy, denial of dismissal under the Speech and Debate Clause of the Constitution, and compulsory psychotropic medication to render defendant competent to stand trial. Ante at 6. I don't believe we can or should expand the category of collateral orders to allow routine review of such pretrial decisions about physical restraints.

The majority relies on *Deck v. Missouri* to conclude that effective review is available on direct appeal from a conviction. That conclusion is not warranted. *Deck* dealt with capital sentencing, and on this point it followed the teaching of *Holbrook v. Flynn* and *Illinois v. Allen*, which addressed security measures during jury trials and the prejudicial effects of visible restraints before juries. I do not share the majority's confidence that the pretrial practice Henderson challenges could ever receive meaningful appellate review through 28 U.S.C. § 1291 after conviction at trial. The effects of such pretrial shackling on the final judgment will be difficult to detect, to put it mildly.

B. *Supervisory Writs of Mandamus*

Better suited to this issue is the relatively rare procedure of a supervisory writ of mandamus, similar to the Ninth Circuit's decision in *Sanchez-Gomez*, 859 F.3d at 649. To be clear, I do not contend here that the use of full restraints on Henderson violates his *constitutional* rights. We do not need to reach the constitutional issue in this case. We can and should just exercise supervisory authority over the practices of district courts within the circuit. And since Henderson has not yet been tried, this appeal is not moot.

A supervisory writ of mandamus is an extraordinary remedy that may be used, in the sound discretion of the appellate court, to exert "supervisory control of the District Courts" under the All Writs Act to ensure "proper judicial administration in the federal system." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259–60 (1957); accord, 16 Wright, Miller, & Cooper, *Federal Practice & Procedure* § 3934; 28 U.S.C. § 1651. This is an appropriate occasion to exercise our discretion. The challenged practice will evade meaningful review through ordinary appellate channels, and the practice is not consistent with the dignity and reputation of the federal courts. A one-time supervisory writ would allow us to address the issue without creating a new category of interlocutory criminal appeals as a matter of right.

The Supreme Court and the federal courts of appeals often say, as the majority does here, that the petitioner must show that his right to the issuance of the writ is "clear and indisputable." Ante at 9, quoting *Cheney v. U.S. District Court for District of Columbia*, 542 U.S. 367, 381 (2004). Citing the Supreme Court's dictum in *Deck* to the effect that the common-law

practice allowed shackles at arraignment, the government argues that even if Henderson might be right on the merits, he cannot win a writ of mandamus under the "clear and indisputable" standard. Also, no Supreme Court or Seventh Circuit precedent or statute or rule of procedure squarely bars the challenged practice of routine pretrial use of full restraints.

There are two independent reasons to reject this argument (apart from the historical error in the *Deck* dictum). First, as shown above, one core principle in the law of courtroom restraints is the requirement that the trial judge herself exercise judgment and discretion that addresses the particulars of the case and the defendant. The record shows here that the district court refused to exercise that judgment and discretion. The judge instead chose to defer to the Marshals Service's blanket policy for all pretrial proceedings in all criminal cases. That refusal by the judge violated a clear and indisputable right. A supervisory writ of mandamus is an exceptional step, but it's the appropriate remedy for this blanket refusal.

Second, despite the frequent and prudent cautions against too-quick resort to writs of mandamus, the Ninth Circuit explained in *Sanchez-Gomez* why, for *supervisory* use of a writ of mandamus, the asserted right need not always be "clear and indisputable." 859 F.3d at 655–56. That much is evident, for example, in *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964), where the Supreme Court reversed this court's *denial* of a supervisory writ of mandamus. The Supreme Court recognized that the underlying issue—a district court's power to order a defendant to submit to physical and mental examinations— was both "substantial" and one of "first impression," yet the Supreme Court itself effectively issued the writ, providing the

guidance that was sought. *Id*. at 111. See also *La Buy*, 352 U.S. at 249 (affirming use of supervisory writ to stop district judge from repeated practice of referring antitrust cases to special masters); *Will v. United States*, 389 U.S. 90 (1967) (vacating unexplained supervisory writ of mandamus but leaving room on remand for another writ with sufficient explanation).[2]

When it comes to the extraordinary remedy of a supervisory writ of mandamus, Professors Wright, Miller, and Cooper provide a helpful explanation of the tension between the cautious language of the Supreme Court and federal circuits and our actual practices, which reflect more flexible pragmatism. 16 *Federal Practice & Procedure* §§ 3934 & 3934.1. "Writ review that responds to occasional special needs provides a valuable ad hoc relief valve for the pressures that are imperfectly contained by the statutes permitting appeals from final judgments and interlocutory orders." § 3934.1 at 671.

A good example is *In re Boehringer Ingelheim Pharmaceuticals, Inc.*, 745 F.3d 216 (7th Cir. 2014), where we issued a writ of mandamus quashing a district court's discovery sanction ordering foreign defendants to bring certain witnesses to the United States for depositions. (I dissented in that case for reasons not relevant here.) The majority said the writ of mandamus was permissible as a "safety valve" enabling appellate review of a discovery order in an exceptional case. *Id*. at 219, citing *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (mandamus can provide "useful safety valve" for

---

[2] Perhaps coincidentally, all three of these "formative" Supreme Court decisions on supervisory writs of mandamus originated with this circuit. See 16 Wright, Miller, & Cooper, *Federal Practice and Procedure* § 3934 at 669.

promptly correcting serious errors). That reasoning applies with even more force here. Unlike the *Boehringer* defendants, who could have violated an interlocutory order and appealed a contempt sanction, for Henderson it is either mandamus or nothing.

Before concluding, I should acknowledge the district judge's references to experiences that she and a lawyer she knows have had with sudden courtroom violence. In *Deck*, the Supreme Court said it was "mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms." 544 U.S. at 632. I hope I am, as well. That's why appellate courts give trial courts considerable discretion in handling these issues of courtroom security. Judge Myerscough's distinguished career on federal and state benches shows her deep devotion to the rule of law and her commitment to treating all parties fairly and with dignity. With respect, however, given the tension between security and fairness, dignity, and decorum, a blanket practice of using maximum security measures for all detained defendants is not the correct answer to this difficult problem. See *United States v. Baker*, 432 F.3d 1189, 1245 (11th Cir. 2005), abrogated on other grounds by *Davis v. Washington*, 547 U.S. 813, 821 (2006) (finding it was "improper for the district court to shackle the defendants based upon what happened in other, unrelated trials involving different defendants and different charges"), citing *Deck*, 544 U.S. at 633.

Accordingly, we should not dismiss this appeal. We should issue a supervisory writ of mandamus to require individualized decision-making before a district court may impose full restraints in the courtroom on pretrial defendants who are still presumed innocent.